Good morning. My name is Lisa Cantor and I'm here this morning on behalf of the appellant Tammy Page. I understand I have 15 minutes for argument. I'd like to reserve five for rebuttal. This erisic case contains a course of conduct by the fiduciary that is so offensive and so outrageous that it alone compels reversal. Certainly coupled with the overwhelming evidence of disability on behalf of Ms. Page, a reversal is warranted. What I'm talking about is the manipulation by Lena of an IME report that it had performed for Ms. Page. Ms. Page... Well, I want to tell you one thing that I found a little disturbing in terms of reading the briefs. You know, I expect both sides in the factual part of it, even though, I mean, the facts are not supposed to be an advocacy situation. I didn't find out until I read the appellee's brief that she had been terminated and their whole part of it was the rollercoaster, is this? Yes, yes, yes. I'm sorry. She'd been terminated... In her job, you know, for a job performance. Well, she was in termination. Well, but that's their side of it. I understand. And so those were facts that, I mean, that a court would... that when I read your facts and then I got to the other one, I didn't even know I was on the same case. So, I mean, I should be able to read the facts of anyone's case and at least I should have all of that in front of me and then go into what the Well, I apologize, Your Honor. Perhaps my passion got the better of me because what happened was her accident happened in April and then she was actually hospitalized a week later. When she returned to work, they terminated her contract, but they paid her for the rest of her contract period, which was two years. They terminated her for cultural reasons. She was a vice president in charge of sales. Now, I understand it's the appellee's position that she sort of made this up after the fact because of poor performance, but the only evidence in the record is that she was terminated for cultural reasons and there's no other explanation. And, in fact, in her offer of proof, because... Well, and I think to fed us all argument, but I still think that those are facts that bear on the resolution of this case. And, I mean, it was completely absent, but, you know, that first time I heard about that was when I got to the other brief. Well, if it was absent from my brief, I apologize. That's not proper. But my point this morning is that Ms. Page was... She had a variety of problems and one of the things she had was a cognitive malfunction or a cognitive deficit. She was sent for a neuropsychological report for an examination, which was prepared by a Dr. Gill. The report was given to Lena. Lena's psychiatrist looks at it and says, I don't believe this report because what Dr. Gill concluded was that she had suffered a brain injury and that her cognitive deficit, which was severe, could not be accounted for by depression alone. Lena's Dr. Fitzpatrick looked at this report and said, I don't think I agree with this conclusion. I'm going to have our own internal psychologist look at the raw data. He gives it to a psychologist named Ben Inkasa. Ben Inkasa says, well, I think the major diagnosis should be depression, not a brain injury. And I think she should be paid under the two year mental and nervous limitation. And so that's what Lena did. But the other important thing that Dr. Ben Inkasa did was because Dr. Fitzpatrick called him back and said, I don't even think she's got depression. I don't think really she's got anything wrong with her. And Ben Inkasa said, no, I think she's got a cognitive impairment. I disagree with the cause. But if you really want to know what the cause is, get an IME, get a neuropsychological evaluation, and I am confident that it will show that it's depression and not a brain injury. Well, guess what? They send her to Dr. Mepchian, who does the additional tests that Ben Inkasa and Fitzpatrick asked for, and he says she's got a brain injury. Here we go. So it is in the two year mental and nervous limitation period of the policy. So what does Lena do then? They call up the company that got Dr. Mepchian's report and they say, make them change it. Make them take out the paragraph that talks about the rollercoaster incident and the possibility of brain injuries on rollercoaster incidents. Make them delete that. And in fact, the interesting thing is we're not exactly sure what they asked him to delete because the critical email from Lena to Univell, the company that engaged Mepchian, is missing from the administrative record. And when we tried to do discovery on this issue, we were shut down. But what we do know is that Dr. Mepchian changes his report and he takes out that paragraph, which he testifies that his deposition was based on research he had done on brain injuries and rollercoasters. He takes it out. But he says, I still believe she has a brain injury. Lena denies her claim, cuts her off, tells her we do not think you have a physical impairment, and never talks about the Mepchian report. Never mentions it. For two years she's trying to get them to reclassify her injury as physical. They deny her. They have in their hip pocket the critical report that says she's got an organic brain injury and they never mention it. Can I ask you, I don't mean to make you digress, but I was looking through this thing to try to find the basis for delegation to Lena. And I must tell you I was puzzled in terms of an ability to locate that. Yeah, I'm puzzled too. There is an SPD in this case, which says I'm in the SPD. There's an employee handbook, which Lena would like to say is a planned document. But the planned document definition does not include the employee handbook. That's right. The SPD does not include the employee handbook. The only delegation of discretion here... Excuse me, what does that mean that the SPD doesn't include the employee handbook? I'm sorry. Did the district court say that the employee benefits plan was the SPD? The district court said the employee benefits plan was the employee handbook, not the SPD. What I call the SPD. There is a document in the SBD-991, and it says this is the SPD. Well, there's certainly in connection with the Lena policy, there's something that says it's the SPD. But then the employer and the plan administrator who's tasked with the obligation puts out a document that says it's an employee's benefit plan, and the district court says that's the SPD and relies on it. Why was that wrong? Well, I think it was wrong because it says that if there's...that they are other planned documents and that those are the planned documents that govern. It is the handbook, that I call it the handbook, is the only document that gives discretion to Lena. Well, so the 2003 document that the Venn D Universal put out, which covers all of their employee benefit plans, which as required under VISA, includes as one part of it this long-term disability. Correct. And so the district court said that's the employer's summary plan description of their employee benefits. Right. Which includes this one part on LTD and then does have the discretionary language giving discretion to Lena. So why was the district court's analysis wrong on that? Well, okay, putting aside the fact that I don't think it was a planned document, I think it was an employee handbook. The other problem is that it says that the plan administrator is universal. Universal has sole discretion and can only delegate discretion for operation and administration of the plan and that it had delegated administration of the plan to Lena, but not discretion to determine benefit eligibility. And in fact, under the terms of the plan, it didn't have the authority to delegate discretion. It says it's delegated benefit claims administration to specified claims administrators and then lists Lena as a benefit claims administrator. Claims administrator. Right. Which normally means they're administrating the claims and deciding who gets it. It can mean that, Your Honor. I guess my point is that if you look at Ingram, it's identifying the entity who administers. It's not saying that they have discretion to do so. And those are two different things. I think that the handbook appears to satisfy the requirements of an SPD under 29 U.S.C. section 1022, but in its own terms are discretionary. But then you also have other plan documents which appear to be the group insurance plan, which is comprised of a certificate and supplemental information and a group policy. And the group insurance plan identifies itself as the SPD and mirrors the language of the group policy and neither document grants discretion to Universal or Lena to decide the terms of the plan or the eligibility of the benefits therein. So there's essentially a conflict. So when you have a conflict, then I guess is, but the district court seemed to have resolved that and said that the handbook was the one. Right. Looked at all of those, said the handbook was the one. So then we have to review that for whether it's clearly erroneous, right? Well, if he's resolving a conflict between two plan documents, I think it's a de novo review because it's what the plan says. You're saying it's a contractual matter of law. Right. It's a contractual matter of interpretation. And it's not that the employee handbook, if it was standing alone and there was nothing else, couldn't be an ERISA plan. It could be. But we have these other documents that say, we are the plan. The handbook that says, if there's any conflict, look at those other documents. And the handbook saying, Universal has sole discretion and can only delegate claims and administration. Now, if claims and administration implies discretion, then they have discretion. My point is that under Ingram and Avady, it only identifies who's doing it. It doesn't say they have discretion. So if, in fact, the court was wrong, then it's a de novo review. But then we look at it de novo. You don't automatically win just because we do de novo. Right. Do you want to reserve three minutes and then come back? Of course. Thank you. Thank you. Good morning, Your Honors. Good morning. Dan McGuire for Appellees Lina and the plan. Why don't you go into that? Because I didn't want to get into that. I did notice a discrepancy there. And it does appear that the district court made a finding of fact. But if, in fact, this is essentially an interpretation of a contract, then it does appear that the plan documents don't give discretion and the handbook does. To answer your question directly, Your Honor, it's not an issue of whether or not it's a finding of fact versus a finding of law on a contract issue. And it's not a finding of law because we all know what the contracts say. So it's a question of whether the facts support the application of the law that the district court made. Well, but what are the disputed facts? There aren't really any here. You've got the handbook and it says one thing. And then you've got the plan documents that say other things. So there really aren't any disputed facts. It's just how do those two... Or three. Or three. Or what takes precedent there? One doesn't grant discretion. The handbook does. I guess the question, Your Honor, is asking is which documents control and how do we decide which ones control. And then once we decide that, how do we determine whether or not that document gives discretion to lineup? And with the court's permission, I'd like to address the issue in that order. Because we have three documents. We have a 2000 policy and certificate SPD. We have an undated handbook, which we don't know for sure when it was produced. And we have a June 2003 employee handbook. So the question is which one applies? Well, Gross Salmon case says that we use the one that was in force at the time that the decision was made. And in this case, the one that was in force at the time the decision was made, which was in October of 2003, was the June 2003 employee handbook, which the court properly found, qualified as a summary plan. So is the factual... That's sort of circular, isn't it? The language that I had noted for and condenses the major provisions of the plan. It does not replace the official plan documents, including insurance policies that govern the plan's operations. In the event of a conflict between this document and the official plan documents, the official plan documents will control. And I went back to the official plan documents and it says the entire contract will be made up of the policy and then the two applications. So where from that do you derive this notion that we can start with the handbook? The handbook is a summary plan description or a portion thereof. It could qualify for that. And I don't think that's really the question, is it? Well, I think it's part of the question, but... It's a question whether it is here. Well, the question is whether or not it's just limited to the policy that was issued by line. It's a whole panoply of benefits that the employer is giving, part of which is funded by the line of plan, part of which is life, part of which is health, medical, pension, a lot of things. So the administrator and the employer, in this case the same entity, generates the summary plan description to summarize what all the plan documents say. I'm not sure I've answered your question. I'm trying... To the extent that the 2003 plan, let's say that's the summary plan description, it's a district court held, and gives this discretion. The other two documents, or I guess the middle one, the pre-2003 also gives discretion to line. Correct. The one that's attached to the line of policy does not. Correct. It's just silent on the issue. Correct. Is there a case law that would suggest there's an inconsistency there, that one grants discretion, one is silent? There's a recent case law in the Ninth Circuit, Your Honor, that I can pull up the site in a moment. But to directly answer your question, the issue is whether or not there's a conflict. Let's assume that we have two concurrent documents. We have, let's say, the line of study was issued the day before the summary plan description. The issue is whether there's a conflict between those two when one says something about discretion and the other is silent. And it's our position that if one document is silent, there's no conflict to start, that you have to start with so you don't have to resolve it. Now, there's a Ninth Circuit case that came out very recently. I was looking at this in preparation. And this, I'm going to give you the site. It's called Gerjanson v. Kemper Insurance, and it's located at 274 Federal Appendix 569. The Westlaw site is 2008 Westlaw 1787484. And this basically says that if there's a grant of discretion in the SPD and not in the policy, that's good enough. For discretion. For discretion. Now, in this particular case that I just cited, the administrator turned out never to have distributed the summary plan description, so the court couldn't rely on it. But that's what the case says. Well, I had noted the decision by this Court in the Shane against Albertson's case that puts a pretty tough standard for that. It says that you require the discretionary authority to be expressly delegated, which is something different from saying that maybe silence would support it, isn't it? That is different, Your Honor. And that really brings us into the second part of that inquiry, which is whether or not that discretion was properly delegated to Linus. Expressly, so. Right. And what's the document? That's really my question. Okay. What's the document that expressly grants the discretion? Okay. The document that expressly grants the discretion is the June 2003 summary plan description, also described as the employee handbook. Okay. And that's what I questioned as to whether that's circular. I guess I'm not following you, Your Honor, and I apologize. I guess not. Because I'm really trying. Don't worry about it. Don't waste your time on it. I just wanted to address briefly, then, the discretionary authority issue in terms of delegation. Well, if we did find that it was de novo reviewed, do you lose then? No, because the court's already found that even under a de novo review that he would have Is that in the district court's finding? Right. Let me get the cite for you on that, Your Honor. I know it's in there. I saw it. Okay. It's the last paragraph. Okay. Thank you. It's kind of that double barrel ending. And I think in a Which I just like to do. Well, I think in a case like this, where, obviously, we have a factually intense record of 2,400 pages, we've got Linus doing 12 to 14 medical reviews, including medical reviews done by the workers' compensation carrier. We've got many treating physicians. A lot of work goes into these cases by everybody. Well, you would have been delinquent not to include it. You presented the findings, the fact, and conclusions, and the judge signed off. As I was ordered to So if you had left that out, you really would have been in trouble. Your arson omissions coverage would have been in peril, wouldn't it? Well, thankfully, Your Honor, I haven't made such a claim over my relatively short career. But the judge ordered me to prepare the findings, and so I complied with the court's order. With regard to the I'm sorry. I would like to exhaust the panel's questions about the standard of review issue. You know, I do sense an interest in this, and I want to make sure that I've responded adequately to all your questions before moving on to whether or not Lina abused its discretion. Ms. Cantor suggested the language that says that the plan has delegated benefit claims administration to specified claims administrators, including Lina, is not enough to delegate discretion. Can you respond to that? Yes, Your Honor. I have not seen a case addressing that argument until very recently, and so I submitted a supplemental authority this week for a district court judge down in San Diego that ruled on the issue. And that case was called Deloach v. San Diego Gas and Electric. And that was submitted to the court. And if you don't have the site handy, it's 2008 West Law, 442-6010. In that case, the pension... Do you want to give me that last number? I'm sorry. You don't have to repeat the 2008 West Law. The other part. 442-6010. Thank you. And in that particular case, the pension committee was granted discretion under the plan documents. And the pension committee delegated the function of determining eligibility for benefits to a subcommittee known as the Benefits Committee. And the plaintiff argued that while the power to make benefit determinations was delegated, the discretion to do so was not. And what Judge Burns held in response to that argument in that case was that the authority to handle benefit claims necessarily entails discretion to make the claim decision. You can't provide the authority to an entity to make a claim decision without giving them the discretion to do that. So I thought that... The reason I submitted that this week was I thought it was on point with that argument. Go ahead and proceed. I think you've answered our questions. Oh, thank you. The next question really is a hybrid issue, which is whether or not the district court correctly applied the Abatey case, and that relates both to standard of review, whether it should be lessened, and also the facts supporting that argument relate to whether or not lineup used its discretion. And ERESA requires us to determine whether or not the plaintiff's challenges are valid through a particular prism that has been established over the years, and that is first, that plaintiff has the burden of proof to demonstrate entitlement to benefits, and second, once that determination has been made by the administrator, the plaintiff has the burden to demonstrate that the administrator abused its discretion. And that's important because if there's any reasonable evidence to that standard, then it must be upheld. And that's for what do you do with, if I can make a bad pun with Ms. Cantor's statement that somehow the thing got doctored in the course of revising the consultant's opinion to delete something that was relevant to the determination. The challenge there, Your Honor, is they're saying that lineup either ignored Dr. Metrian's opinion or worse, they twisted his arm to make him change it. Not only did they change it themselves, but they twisted his arm to make him change it. Now, I would point out that there's no evidence in the record that lineup did any such thing, but all we have is the report A from Dr. Metrian and report B from Dr. Metrian, and report B takes out a certain paragraph, and so the assumption is made, and I think probably rightly so, that somebody talked to him and said, well, wait a minute, what are you doing here? You're going beyond the scope of your expertise. I don't think that's, per se, improper when a doctor goes beyond the scope of his expertise, even the ethical guidelines that govern his profession require him to stay within those bounds. And so, in addressing Dr. Metrian in a little bit more detail, the purpose of his review, of course, was to help lineup determine whether Ms. Page was disabled from a mental condition. And he thought that she was. And as a result of that, lineup continued to pay the claim until the two-year mental and nervous limitation had been exhausted. Now, lineup never challenged that opinion, never asked him to change his conclusions. There was no pressure on Dr. Metrian to do so. He never changed his opinion. He maintained the position that she was unable to perform the duties of her occupation due to a mental nervous condition, and we accepted that. Now, the part that was removed was speculation. And with regard to why we know it's speculation, well, we know because Ms. Page had the opportunity to depose Dr. Metrian. And in his deposition, which is part of the record, he said that he was not aware of the basic foundational facts, which would provide a basis to conclude that she endured some kind of cognitive deficit by reason of a physical impact of a roller coaster. He said he did not know what the duration of the ride was. He didn't know any of the facts surrounding the ride. He didn't know anything about the biomechanics of the ride. He just says, well, he read a couple of articles, and it's possible. Now, the other part of Judge Shader's inquiry is, well, didn't line it in, or Ms. Page said, didn't line it in trying to hide the ball. First they twisted the guy's arm, then they tried to hide the ball that they did it. Well, all the evidence is in the record. Both reports are in the record. Both reports were sent to every doctor who looked at this thing from that point forward. There's simply no evidence that that line had tried to hide anything. Now, the claim itself was only terminated a year later, after Dr. Mechian's review, and only after it was reviewed by physicians, medical doctors, who were qualified to make the determination on whether or not there's a physical component to Ms. Page's claimed injury. Is there anything else about Dr. Mechian before I move on quickly, as my time is expiring? With regard to the evidence in the findings of fact and conclusions of law, and in the briefs I've discussed at length, the various aspects of Ms. Page's claimed complaints.  It's our position that there were tremendous inconsistencies in the subjective reporting, in addition to a complete absence of objective evidence. And so based on that, it's our belief that the court did not abuse its discretion in finding that Ms. Page's claim was properly terminated by lineup. Or even if there were a de novo review, it would not be erroneous. Is your position. That's right. And there was plenty of work that went into that determination, as I've already alluded to briefly. But I think the thing that struck me most was the inconsistencies. And one more point I would like to raise. I'm sorry, I have 45 seconds left. But one point is that Ms. Page is saying that a lineup changed its position in terms of the basis for the denial. Because here in the litigation, all of a sudden we're arguing that the accident never happened. Well, I don't know if the accident happened or not. But I can look at this record and say that it seems pretty odd that she would have this terrible accident on a roller coaster, and there's no evidence she reported it to anyone. Not even to her own doctor that she sees two months later. Not even to her neurologist. Not even to her dentist, which she says she has to fly back from an amusement park on an emergency basis to get dental surgery. Or to her periodontist. Or to an emergency room 10 days later when she's in for a sudden onset of back pain after she bent down to pick up a towel. Or to her physical therapist. So there's many, many chances she had to mention this injury. She never did. I think that calls it into question. The judge's findings of credibility are entitled to deference. And with that, Your Honor, I will close. And I would ask respectfully that the district court's judgment be affirmed. Thank you for your argument. Thank you, Your Honors. The district court didn't make any findings. Defense counsel made findings that the district court signed. And that's an important point. Well, but then they become the findings. Well, they become the findings, Your Honor. But remember- Did you object to them? Yes, we did. But he had already signed them. Within 24 hours of them being submitted, he had already signed them. Let me talk about- Well, after you objected, did the court change them? No. Okay. Lena decided to pay this claim before Dr. Mepchian was asked to prepare his report. So the idea that they followed Mepchian's report is false. He was specifically hired to determine whether her cognitive disorder was physical or mental. That was his assignment. He decided it was physical. It is that precise finding that Lena never considered, never rejected, never mentioned in any of their denial letters. What would have prevented you, if what you're saying, if she has these injuries and he withdrew them because he didn't allegedly have the expertise to make that conclusion, what would have prevented you from getting that sort of opinion from a doctor that would have all that information and would have the expertise? First of all, it doesn't matter if it was caused by the roller coaster or not. He still concluded she had a cognitive disorder caused by a traumatic brain injury. I wouldn't need to get- Well, but wouldn't it have to be a physical injury that happened at work? No. Why would it have to be a physical injury? This is not a worker's comp case. Well, but she was claiming, that's what she said, it happened because of the roller coaster, so- I understand that, but he decided that it was, he thought it was caused by the roller coaster. Dr. Gill decided he thought it was caused by the roller coaster. No one has said anything different. Dr. Growlick, who looked at the file on appeal, specifically testified that he has no idea whether her cognitive disorder is physical or mental and that if the roller coaster had malfunctioned, yes, in fact, it could have caused a traumatic brain injury. So there's not a shred of evidence in this file that she does not suffer from a traumatic brain injury. In fact, all the evidence is that she does and that that is the cause of her cognitive dysfunction. On top of that, there is a whole host of evidence about her other problems. She has a neurogenic bladder. She has to self-catheterize. That was confirmed by three urologists, two neurologists, and a doctor she was sent to by the defense council in the worker's comp arena. And they all, again, brought this back to the roller coaster injury or some traumatic force that affected her body and affected her neurological system. The issue... All right, you need to wrap up. I'm sorry. The defense council said that there's no evidence that Lena asked Dr. Mechian to change his report. At ER 1209 to 1210, there's a specific telephone log where they contacted Unival and asked him to change his report. The language they found offensive was that he was speculating as to causation. But when Dr. Growler comes in on appeal and speculates to the opposite, they have absolutely no problem with it. This is a complete violation of what Glenn v. MetLife requires and specifically what SAFUN requires in terms of communication with the insured. We would ask that the judgment be reversed. All right, thank you for your argument. Thank you. That will stand submitted. Thank you. The last matter on calendar is Judith Leon v. Kinteles Transportation Corporation. 0755659. Thank you.
judges: Callahan, Ikuta, Shadur